In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 13-2943

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JASON L. WHITE,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:12-cr-30022-DRH-1 — **David R. Herndon**, *Judge.*

———————

ARGUED JULY 8, 2014 — DECIDED MARCH 25, 2015

———————

Before WOOD, *Chief Judge*, and BAUER and HAMILTON,
*Circuit Judges*.

HAMILTON, *Circuit Judge*. While defendant-appellant Jason White was on parole from an Illinois state prison sentence, police suspected that he was involved in a shooting and had a warrant to arrest him. Before the police found White, they located his gym bag that he had left in his

cousin's car. Without a search warrant, but relying on a condition of his parole that required White to agree to searches of his property, the police opened the bag and found a gun. White was convicted of being a felon in possession of a firearm. He moved to suppress evidence of the gun on the ground that neither he nor his cousin had consented to the search of the bag. The district court denied his motion, and White challenges that decision on appeal. We affirm. The search of the property of a suspected parole violator who had agreed in writing to consent to property searches and whom the police could not locate was reasonable.

I.  *Factual and Procedural Background*

The Illinois Department of Corrections issued a warrant on March 29, 2011 to arrest White for violating his parole. The warrant was based on two discoveries. First, one of two victims from a shooting a week earlier had identified White as the shooter. Second, earlier that month a parole officer had found in White's bedroom the packaging for a Glock .40 caliber magazine. Two days after the warrant was issued, the police received a tip that White was driving a green sport utility vehicle.

That tip led the officers to the home of White's cousin, Tawana Williams. They knew she drove such a car. Williams told the police that she and White had been together earlier that day and that White had placed his gym bag in her car. The police searched White's bag and found a .40 caliber Glock handgun loaded with 10 rounds of ammunition. White was later arrested and charged with possessing a firearm and ammunition as a felon in violation of 18 U.S.C. § 922(g)(1).

White moved to suppress the evidence seized from his gym bag in his cousin's car, arguing that the warrantless search of his bag violated the Fourth Amendment. He argued that, even though he was a parolee and had left his bag with Williams, he enjoyed a legitimate expectation of privacy in the contents of his bag and that Williams had neither actual nor apparent authority to consent to the bag's search. The government countered that White's status as a parolee extinguished any expectation of privacy. It explained that when White began his term of supervisory release from an Illinois prison (where he served a sentence for unlawful possession of a firearm), he agreed in writing as a condition of release: "You shall consent to a search of your person, property, or residence under your control." The government also argued that the search was valid because the police suspected White of a shooting, feared he was dangerous, and were in hot pursuit to arrest him.

In a hearing on the motion to suppress, the parties disputed whether White's cousin Williams had actually consented to the search of the bag. She testified that the morning of the search, she had met briefly with White and he asked her to store his bag in her car. White did not tell her what was inside the bag, nor did she look inside. Later that day, Williams said, about 20 officers arrived at her home. One demanded that she let them search her car and threatened that if she did not, they would get a warrant and arrest her for any contraband found in it. Acquiescing, she allowed the officers to search the car. In her hearing testimony she characterized the officers as threatening. On cross-examination, though, she acknowledged that in a recorded interview at the police station on the day of the search, she had said that

she had allowed the police to search the car and had not claimed that they had threatened her.

Next to testify was Officer Thomas Woods, who participated in the search. He testified that before the search, the police had learned that a shooting victim had identified White as the shooter and that the police believed he was armed and dangerous. Woods also testified that Williams told him that White had left bags in her car and that she volunteered, "You can have 'em." With her permission, he entered the car, retrieved and opened White's bag, and found the gun inside. Officer Woods explained that Williams had been cooperative, that he never threatened her, and that he searched the car only after she volunteered the information that White had stored a bag inside and allowed him access to it.

The district court denied White's motion to suppress evidence of the gun. Based on the videotaped interview of Williams, the court found as a fact that she freely consented to the police search of her car. The court also concluded that White's privacy rights were so diminished by his parole status and his promise to consent to searches that the search of the bag was reasonable. White then went to trial. A jury found him guilty of the firearm charge. The district court sentenced him to 360 months in prison, consistent with White's status as a career offender.

II. *Analysis*

On appeal White argues only that the search of his gym bag violated his right under the Fourth Amendment to be free from unreasonable searches. He insists that, despite the conditions of his parole, he had a protectable privacy interest

in the closed gym bag in which the police found the gun, and that he did not relinquish that interest by placing it in Williams' car. He also argues that Williams did not have actual or apparent authority to give third-party consent to the warrantless search of the bag. The government counters that neither her consent nor a warrant was required because of White's diminished privacy expectations as a parolee subject to the terms of his parole agreement requiring consent to searches of his property. The government argues in the alternative that the search was reasonable because the police were in hot pursuit of an armed and dangerous felony suspect. We find that the search of the bag was reasonable based on White's sharply diminished privacy expectations as a parolee who was required to consent to searches of his property. We do not reach the government's exigent circumstances argument.

A preliminary question concerns the first step of searching Williams' car. The district court made a factual finding that Williams consented to the search of her car. We find no basis to disturb that finding, which is not clearly erroneous. See *United States v. Terry*, 572 F.3d 430, 434–35 (7th Cir. 2009). Without reaching any question about whether White is a proper party to object to that first step, therefore, Williams' consent to the search of her car made it permissible under the Fourth Amendment. That lawful search led to the discovery of White's bag.

The central issue is whether the search of White's bag was lawful. The district court determined that it was because, in its view, White had consented based on the condition of his release requiring that he "shall consent to a search of your … property." The district court and we apply federal

Fourth Amendment law to decide whether the search was reasonable. Because that question turns in large part on the extent of White's legitimate expectations of privacy, see, e.g., *Maryland v. King*, 569 U.S. —, 133 S. Ct. 1958, 1978 (2013), our analysis is shaped by the state law that governed White's terms of parole. See, e.g., *Samson v. California*, 547 U.S. 843 (2006) (suspicionless, warrantless search of parolee did not violate Fourth Amendment where state law authorized search as condition of parole); *United States v. Knights*, 534 U.S. 112 (2001) (warrantless search of probationer based on reasonable suspicion did not violate Fourth Amendment where state law authorized search as condition of probation).

Based on the Supreme Court's decisions in *Samson* and *Knights*, one might conclude quickly that the condition of White's parole requiring consent to warrantless searches of his property easily resolves this case in favor of the government. Our path to that destination is a little less direct, though, because of some intricacies of Illinois law. We trace the key cases briefly:

In *People v. Lampitok*, 798 N.E.2d 91 (Ill. 2003), the defendant was sharing a motel room with his fiancée, who was on probation at the time. One condition of her probation required her to "submit to a search of her person, residence, or automobile at any time as directed by her Probation Officer." Police conducted a warrantless search of the motel room and found drugs and weapons used to convict Lampitok of several crimes. The Illinois court interpreted *Knights* to require at least reasonable suspicion of a probation violation to justify the search. It also held there was no reasonable suspicion to justify a search of the motel room for drugs or weapons.

798 N.E.2d at 109. On the issue of consent, the Illinois court parsed the language of the parole conditions very finely, noting that they did not actually authorize a warrantless search itself but required only that the probationer "submit" to such a search. The court concluded that the condition of probation gave the probationer a choice: either "submit" (i.e., consent) to a search or face a possible probation revocation for refusal to consent. The condition itself, though, did not actually authorize warrantless searches. *Id.* at 110. Since no consent had been given, the court ruled in *Lampitok*, the evidence seized in the warrantless search was properly suppressed.

Five years later, after *Samson* had been decided, the Illinois court decided *People v. Wilson*, 885 N.E.2d 1033 (Ill. 2008), and followed and extended the reasoning of *Lampitok* to a defendant subject to the same parole condition that applied to White in this case. In *Wilson* the defendant was on parole. One condition required him to "consent to a search of your person, property, or residence under your control." Police carried out a search of the defendant's residence without a warrant and without his explicit consent. The state argued that the defendant's agreement to the conditions of parole amounted to consent. Again parsing the conditions closely, this time of parole, the Illinois court found there was no prospective consent because the condition required the parolee's consent in the future (and a refusal would be a violation) but did not actually give consent. 885 N.E.2d at 1036. The court went on to conclude, however, that the U.S. Supreme Court's intervening decision in *Samson* meant that the defendant's expectations of privacy were so diminished that the warrantless search was permissible. *Id*. at 1038–43.

Then in *People v. Absher*, 950 N.E.2d 659 (Ill. 2011), the Illinois court was asked in effect to overrule *Lampitok* in light of *Samson* and our decision in *United States v. Barnett*, 415 F.3d 690 (7th Cir. 2005), in which we held that an Illinois probationer's agreement to a suspicionless search condition amounted to a prospective waiver of his privacy rights. The court ruled in favor of the state, allowing the suspicionless search. *Absher* seems to have limited *Lampitok* virtually to its facts without quite overruling it. See 950 N.E.2d at 667–68 (distinguishing and limiting *Lampitok*). After *Absher*, an Illinois probationer's agreement to consent to suspicionless searches is best understood has having the effect of waiving his Fourth Amendment rights. See *id*. at 668.

The Illinois Supreme Court may well extend the reasoning of *Absher* from probation to parolees like White, but we need not rely on such an extension here. Even if White's agreement to the conditions of parole were not deemed a prospective consent to a warrantless search of his bag, his status as a parolee is the critical factor showing that the search was nonetheless reasonable under the Fourth Amendment. To explain that conclusion, we probe more deeply into the Supreme Court's decision in *Samson v. California*, 547 U.S. 843 (2006).

To determine the reasonableness of a search under the Fourth Amendment, we look at the totality of the circumstances, balancing the degree to which the search intrudes on individual liberty and the degree to which it promotes legitimate governmental interests. *Wyoming v. Houghton*, 526 U.S. 295, 300 (1999); *Narducci v. Moore*, 572 F.3d 313, 319 (7th Cir. 2009). Balancing those interests, the Supreme Court in *Samson* upheld a warrantless and suspicionless search of a

parolee. There, the Court analyzed a parole condition substantively identical to the condition requiring White to "consent to a search of your person, property, or residence under your control." Compare 730 ILCS 5/3–3–7(10) and *People v. Wilson,* 885 N.E.2d 1033, 1041–42 (Ill. 2008), with *Samson,* 547 U.S. at 846.

Without deciding whether that consent led to "a complete waiver" of Fourth Amendment rights, see *Samson*, 547 U.S. at 852 n.3, the Court nonetheless held that, in balancing the relevant interests, the search was reasonable. It observed first that the government has an "overwhelming interest" in supervising parolees because they are more likely to commit crimes and must be reintegrated into the community. *Id.* at 853. Given that interest, the Court concluded that a "condition of release can so diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment." *Id.* at 847. Thus, under *Samson*, even if White did not actually consent to the bag's search, his significantly diminished expectation of privacy balanced against the government's substantial law-enforcement interest renders the search reasonable and therefore lawful.

To oppose this conclusion, White points out that, unlike the parolee in *Samson,* he was not present for the search. He contends that *Samson* applies only when a parolee has immediate access to the searched property. He offers three reasons to distinguish between a search that occurs out of his presence and one that occurs in his presence, but none is persuasive.

First, White contends that his privacy interest in his bag did not vanish just because he put it in Williams' car, out of

his immediate control. But his parolee status coupled with his supervisory-release agreement diminished any legitimate privacy interest *before* he left his bag in Williams' car. "[P]arolees are on the 'continuum' of state-imposed punishments" and thus have fewer expectations of privacy in general. *Samson*, 547 U.S. at 850; see *United States v. Huart*, 735 F.3d 972, 975 (7th Cir. 2013); *United States v. Sullivan*, 753 F.3d 845, 855 (9th Cir. 2014). Those reduced expectations are diminished further where, as here, a condition of parole requires the parolee to submit—unconditionally—to searches of his person, property, and residence. See *Samson*, 547 U.S. at 852; see also *United States v. Knights*, 534 U.S. 112, 114, 119–20 (2001) (assessing similar search condition for California probation). If White had been present for the search and refused to consent to it, the search would nonetheless have been reasonable in light of his minimal expectation of privacy. The bag's relocation to the car cannot have affected those already-diminished privacy expectations. If we adopted White's reasoning, we would have to conclude that a parolee acquired greater privacy rights in property by separating himself from the property and eluding police than he would have had by retaining physical possession of it and being stopped by the police. We see no good reason to reach that odd result.

Second, White believes that because he was not near his bag, the police had ample time to seek and obtain a search warrant. There was no reason to suspect that he could destroy its contents or that the bag would connect him to a crime that was occurring as the police might have sought a warrant. But the *Samson* holding that a parolee has substantially reduced expectations of privacy that allow a warrantless search did not depend on the impracticality of securing

a warrant, the presence of suspected criminal activity, or the risk that evidence might be lost. See *Samson*, 547 U.S. at 850–55. Moreover, the police here did have reason to suspect that White's bag might contain incriminating evidence. White was suspected of the serious crime of shooting two people, and his parole officer had found in White's bedroom packaging for a magazine for the same kind of ammunition used in the shooting. Mere possession of such ammunition would have been a serious federal crime for White because of his criminal record. Given this reasonable suspicion and his sharply diminished privacy expectations, the warrantless search of his bag to see if it contained further evidence of a crime was reasonable.

Third, White relies on two Illinois appellate decisions that emphasize that searches of parolees must be reasonable. Neither case shows why *this* search might have been unreasonable. In *People v. Coleman*, 2 N.E.3d 1221, 1224–25 (Ill. App. 2014), the court concluded that a search of a parolee without a warrant or consent was unreasonable. But that conclusion was based on the fact that, at the time of the search, the officer was not aware that the suspect was on parole. Here, the officers knew that White was a parolee: they were attempting to execute a warrant to arrest him for parole violations.

In *People v. LeFlore*, 996 N.E.2d 678, 688, 690–91 (Ill. App. 2013), the court concluded that a parolee who had consented to searches as a condition of release was nonetheless protected by the holding of *United States v. Jones*, 565 U.S. —, 132 S. Ct. 945, 949 (2012). *Jones* held that the government violated the Fourth Amendment by attaching a GPS device to a car, without a warrant, for the purpose of tracking the target's

movement, at least over an extended period of time. But be-
cause GPS tracking involves "continuous, surreptitious, and
potentially indefinite" detection of ongoing activities,
*LeFlore*, 996 N.E.2d at 690, it can be more invasive than the
one-time physical search of White's bag to locate evidence of
a crime that had already occurred. In fact, the majority in
*LeFlore* distinguished *People v. Wilson* on exactly this basis.
See *id*. at 690–91 (also noting that parole condition expressly
consenting to electronic monitoring had expired). Moreover,
unlike a GPS search, the search of White's gym bag fell
squarely within the terms of the conditions of his parole. For
these reasons, neither Illinois case alters our conclusion that
the search here was reasonable under federal constitutional
standards.

Because the search of the bag that White left in his
cousin's car was reasonable given his status as a parolee, we
need not address the parties' remaining arguments about
other justifications for the search.

AFFIRMED.